1
2
3
4
5

**COPPERSMITH BROCKELMAN PLC**
Keith Beauchamp (012434)
2800 North Central Avenue, Suite 1900
Phoenix, AZ 85004
Telephone: 602-381-5490
Facsimile:  602-244-6020
kbeauchamp@cblawyers.com

6
7
8
9
10
11
12

**ROBINS KAPLAN LLP**
Jeffrey S. Gleason (admitted *pro hac vice*)
Thomas C. Mahlum (admitted *pro hac vice*)
Jamie R. Kurtz (admitted *pro hac vice*)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  612-349-8500
Facsimile:   612-339-4181
JGleason@RobinsKaplan.com
TMahlum@RobinsKaplan.com
JKurtz@RobinsKaplan.com

13
14

*Attorneys for Plaintiffs*

15
16

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

17
18
19
20
21
22
23
24
25
26
27
28

Blue Cross of California, Inc. d/b/a/ Anthem Blue Cross of California; Anthem Blue Cross Life and Health Insurance Company; Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado and Anthem Blue Cross and Blue Shield of Nevada; Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc.; Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana; Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky; Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine; Anthem Health Plans of New Hampshire, Inc.

No. 2:17-cv-02286-DLR

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

{00378352.1 }

d/b/a Anthem Blue Cross and Blue Shield of
New Hampshire; Empire HealthChoice
Assurance, Inc. d/b/a Empire Blue Cross and
Blue Shield; Community Insurance Company
d/b/a Anthem Blue Cross and Blue Shield of
Ohio; Anthem Health Plans of Virginia, Inc.
d/b/a Anthem Blue Cross and Blue Shield of
Virginia; HMO Healthkeepers, Inc. d/b/a
Anthem Blue Cross and Blue Shield of
Virginia; Blue Cross Blue Shield of Wisconsin
d/b/a Anthem Blue Cross and Blue Shield of
Wisconsin; Compcare Health Services
Insurance Corporation d/b/a Anthem Blue
Cross and Blue Shield of Wisconsin,

Plaintiffs,

v.

Insys Therapeutics, Inc.,

Defendant.

Plaintiffs Blue Cross of California, Inc. d/b/a/ Anthem Blue Cross of California;

Anthem Blue Cross Life and Health Insurance Company; Rocky Mountain Hospital and

Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado and Anthem

Blue Cross and Blue Shield of Nevada; Anthem Health Plans, Inc. d/b/a Anthem Blue

Cross and Blue Shield of Connecticut; Blue Cross and Blue Shield of Georgia, Inc.; Blue

Cross and Blue Shield Healthcare Plan of Georgia, Inc.; Anthem Insurance Companies,

Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana; Anthem Health Plans of

Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky; Anthem Health

Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine; Anthem Health

Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New

Hampshire; Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue

Shield; Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of

Ohio; Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

Virginia; HMO Healthkeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia; Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin; Compare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield of Wisconsin (collectively, "Anthem"), in their Second Amended Complaint against Defendant Insys Therapeutics, Inc. ("Insys") hereby state and allege as follows.

## NATURE OF ACTION

1.      Since at least 2013, Insys, the manufacturer, marketer, and seller of the branded opioid, Subsys, has engaged in a carefully-orchestrated, illegal, and dangerous scheme to obtain millions of dollars in reimbursement from health insurers, including Anthem, that the company knew it was not entitled to.

2.      Subsys is one of the most powerful narcotics available and is estimated to be 50 times as potent as heroin. Its side effects include death by respiratory suppression. Accordingly, the drug was approved by FDA for only a narrow patient population – individuals with breakthrough cancer pain who were opioid tolerant.

3.      As Insys recognized, while the "on-label" market for Subsys was limited, "off-label" use could present significant financial rewards. The country's consumption of opioids is well documented and Subsys was a particularly attractive new option given its potency and its sublingual delivery.

4.      But standing in its way of capturing that off-label market, Insys faced at least two significant impediments. *First*, the company had to convince prescribers to write prescriptions for this remarkably dangerous drug for treatment beyond what FDA had approved it for – thereby subjecting their patient population to the accompanying risks the drug presented. And *second*, Insys had to find a way to get the prescriptions paid for in a world in which health insurers, including Medicare, Medicaid, and private payors such as Anthem, would only cover Subsys for on-label uses.

5.      Insys's solution to these two potential roadblocks was creative, fraudulent, and illegal.

6.      Insys drove off-label demand by, in essence, paying prescribers to write

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

prescriptions and by marketing off-label uses of the drug. Undoubtedly recognizing the illegality of such a scheme, Insys attempted to disguise its payments to prescribers by structuring them as sham "speaker fees." While the exact amount of those kickbacks has yet to be determined, criminal indictments of the recipients indicate that Insys paid "speaker fees" of hundreds of thousands, if not millions, of dollars.

7.     To address the reimbursement challenge that it faced, Insys simply lied about the reasons the prescriptions were being written. Because of the risk profile of the drug and its high cost, Anthem, like other health insurers, required that a prior authorization be obtained before a claim could be submitted for a Subsys prescription. Anthem's prior authorization required confirmation that the patient had an active cancer diagnosis, was being treated by an opioid (and, thus, was opioid tolerant), and was being prescribed Subsys to treat breakthrough pain that the other opioid could not eliminate. If any one of those factors was not present, the prior authorization would be denied and the drug would not be covered under Anthem's plans – meaning no reimbursement would be due.

8.     Information that has become publically available reveals Insys's company-wide scheme to lie to insurers during the prior-authorization process. In particular, Insys created its own "reimbursement team" that was tasked with taking the prior-authorization process out of the hands of prescribers' offices such that Insys would control the information conveyed to the insurer. And that information was decidedly false and misleading. Under instruction of management, reimbursement team members routinely, intentionally, and falsely represented that enrollees in Anthem plans met each of the criteria necessary to render Subsys prescriptions covered and payable when Insys knew that was not the case.

9.     Insys's schemes paid off in spades, driving significant off-label use and securing payments in excess of $19 million from Anthem for Subsys prescriptions that were not covered, in addition to the millions of dollars in cost-sharing obligations imposed on Anthem members.

10.     But the harm inflicted by Insys's conduct is not merely financial in nature.

Insys put Anthem's members' health at risk. As the Office of Inspector General for the Department of Health and Human Services has recognized, paying kickbacks to prescribers in exchange for prescriptions calls into question the clinician's medical judgment. And the risks associated with that illegal scheme are all the greater when the prescriptions at issue are for a drug as dangerous as Subsys.

11.     Accordingly, Anthem brings this action to put a stop to Insys's dangerous, illegal, and fraudulent conduct and to hold Insys accountable for the financial harm it has caused Anthem.

## PARTIES

12.     Plaintiff Blue Cross of California, Inc. d/b/a/ Anthem Blue Cross of California is incorporated and headquartered in California.

13.     Plaintiff Anthem Blue Cross Life and Health Insurance Company is incorporated and headquartered in California.

14.     Plaintiff Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado and d/b/a/ Anthem Blue Cross and Blue Shield of Nevada in Nevada, is incorporated and headquartered in Colorado.

15.     Plaintiff Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut is incorporated and headquartered in Connecticut.

16.     Plaintiff Blue Cross and Blue Shield of Georgia, Inc. is incorporated and headquartered in Georgia.

17.     Plaintiff Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc. is incorporated and headquartered in Georgia.

18.     Plaintiff Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana is incorporated and headquartered in Indiana.

19.     Plaintiff Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky is incorporated and headquartered in Kentucky.

20.     Plaintiff Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine is incorporated and headquartered in Maine.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

21.     Plaintiff Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire is incorporated and headquartered in New Hampshire.

22.     Plaintiff Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is incorporated and headquartered in New York.

23.     Plaintiff Community Insurance Company d/b/a/ Anthem Blue Cross and Blue Shield of Ohio is incorporated and headquartered in Ohio.

24.     Plaintiff Anthem Health Plans of Virginia, Inc. d/b/a/ Anthem Blue Cross and Blue Shield of Virginia is incorporated and headquartered in Virginia.

25.     Plaintiff HMO HealthKeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia is incorporated and headquartered in Virginia.

26.     Plaintiff Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin is incorporated and headquartered in Wisconsin.

27.     Plaintiff Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield of Wisconsin is incorporated and headquartered in Wisconsin.

28.     The Plaintiffs are all owned by Anthem, Inc. and are collectively referred to herein as "Anthem."

29.     Defendant Insys Therapeutics, Inc. is a drug manufacturer, marketer, and seller. Insys is a Delaware corporation and is headquartered in Arizona. Insys manufactures and sells fentanyl sublingual spray, an opioid approved by FDA for treatment of breakthrough pain in cancer patients who are already receiving and tolerant to opioids for the management of chronic pain. The brand name for this drug is Subsys.

## **JURISDICTION AND VENUE**

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332 because the Anthem plaintiffs and Insys are citizens of different states.

31.     This Court has personal jurisdiction over Insys and venue is proper in this Judicial District under 28 U.S.C. §§ 1391(b) and (c) because Insys has its principal place of business in this Judicial District and a substantial part of the events giving rise to the

1    claims occurred in this Judicial District.

2    **FACTUAL BACKGROUND**

3        32.    Since at least 2013, Insys has engaged in a fraudulent, illegal, and unfair

4    scheme designed to unlawfully and unjustly obtain reimbursements from Anthem for

5    prescriptions of Subsys that are not reimbursable because the patients receiving the

6    prescriptions either do not have breakthrough cancer pain or are not tolerant to opioids.

7    **FDA Approval Process and Subsys Indication**

8        33.    Under the Food, Drug, and Cosmetics Act ("FDCA") 21 U.S.C. §§ 301-97,

9    new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of

10   the drug demonstrates to the satisfaction of FDA that the drug is safe and effective for

11   each of its intended uses. 21 U.S.C. § 355(a) & (d). Approval of a drug by FDA is the

12   final stage of a multi-year process of study and testing.

13       34.    FDA does not approve a drug for treatment of sickness in general. Instead, a

14   drug is approved for treatment of a specific condition, for which the drug has been tested

15   in patients. The specific approved use is called the "indication" for which the drug may be

16   prescribed. FDA will specify particular dosages determined to be safe and effective for

17   each indication.

18       35.    The indications and dosages approved by FDA are set forth in the drug's

19   labeling, the content of which must also be reviewed and approved by FDA. 21 U.S.C.

20   §§ 352, 355(d).

21       36.    Under the Food and Drug Administration Modernization Act of 1997

22   ("FDAMA"), if a manufacturer wishes to market or promote an approved drug for

23   alternative uses – i.e. uses not approved by FDA – the manufacturer must resubmit the

24   drug for another series of clinical trials similar to those for the initial approval. 21 U.S.C.

25   § 360aaa(b) & (c). Until subsequent approval of the new use has been granted, the

26   unapproved use is considered to be "off-label." "Off-label" refers to the use of an

27   approved drug for any purpose, or in any manner, other than what is described in the

28   drug's labeling. Off-label use includes treating a condition not indicated on the label,

ROBINS KAPLAN LLP<br>ATTORNEYS AT LAW<br>MINNEAPOLIS

treating the indicated condition at a different dose or frequency than specified on the label, or treating a different patient population (e.g., treating a child when the drug is approved to treat adults.)

37.     Although prescribers may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing or promoting a drug for a use that FDA has not approved. Specifically, under the Food and Drug laws, (1) a manufacturer may not introduce a drug into interstate commerce with an intent that it be used for an off-label purpose, and (2) a manufacturer illegally "misbrands" a drug if the drug's labeling (which includes all marketing and promotional materials relating to the drug) describes intended uses for the drug that have not been approved by FDA. 21 U.S.C. §§ 331, 352.

38.     In sum, the FDCA prohibits drug companies from promoting approved drugs for unapproved uses or from making misleading claims as to the drug's safety or effectiveness. See 21 U.S.C. §§ 331, 352, 355(d). This off-label regulatory scheme protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific government body, the FDA.

39.     Subsys is only FDA approved for a limited indication – for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain. Further, Subsys may be dispensed only to patients enrolled in the Transmucosal Immediate Release Fentanyl ("TIRF") Risk Evaluation and Mitigation Strategy ("REMS") ACCESS program.

40.     However, despite the limited indicated use of Subsys for breakthrough cancer pain, a very small percentage of prescribers are oncologists. The majority of prescribers are pain specialists, although primary care physicians, neurologists, dentists and podiatrists also write Subsys prescriptions.

41.     Insys's proposed Subsys labeling, submitted as part of its NDA and approved by the FDA, contains repeated warnings about its dangers, as well as

instructions that must be followed to ensure its safe use and to mitigate its risks.

42.     Subsys's label also makes unequivocally clear that the "initial dose of SUBSYS to treat episodes of breakthrough cancer pain is **always** 100 mcg." (emphasis in original).

43.     Subsys's label also warned that it is prohibited and highly dangerous to convert patients on a one-to-one dosage basis from other formulations of fentanyl:

Important Information Regarding Prescribing and Dispensing

SUBSYS is not bioequivalent with other fentanyl products. Do not convert patients on a mcg per mcg basis from other fentanyl products.

**When dispensing, DO NOT substitute a SUBSYS prescription for any other fentanyl product.** Substantial differences exist in the pharmacokinetic profile of SUBSYS compared to other fentanyl products that result in clinically important differences in the rate and extent of absorption of fentanyl. **As a result of these differences, the substitution of the same dose of SUBSYS for the same dose of any other fentanyl products may result in a fatal overdose.**

There are no conversion directions available for patients on any other fentanyl products. (Note: This includes oral, transdermal, or parenteral formulations of fentanyl.) All patients should be titrated from the 100 mcg dose. Titrate each patient individually to provide adequate analgesia while minimizing side effects.

(emphases in original).

44.     On July 31, 2013, more than a year after Insys began to sell and market Subsys throughout the United States, the FDA approved a supplemental NDA submitted by Insys that slightly changed Subsys's labeling to reflect the following:

Conversion from Actiq to SUBYS

The initial dose of SUBSYS is always 100 mcg with the only exception of [sic] patients already using Actiq.

a.     For patients being converted from Actiq, prescribers must use the Initial Dosing Recommendations for Patients on Actiq table below[.] ...

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

Robins Kaplan LLP
ATTORNEYS AT LAW
MINNEAPOLIS

| Current ACTIQ Dose (mcg) | Initial SUBSYS Dose (mcg) |
|---|---|
| 200 | 100 mcg spray |
| 400 | 100 mcg spray |
| 600 | 200 mcg spray |
| 800 | 200 mcg spray |
| 1200 | 400 mcg spray |
| 1600 | 400 mcg spray |

45.    For all other patients the label provides:

Individually titrate SUBSYS to a dose that provides adequate analgesia and minimizes side effects. The initial dose of SUBSYS to treat episodes of breakthrough cancer pain is **always** 100 mcg. **When prescribing, do not switch patients on a mcg per mcg basis from any other oral transmucosal fentanyl product to SUBSYS** as SUBSYS is not equivalent on a mcg per mcg basis with any other fentanyl product[.]

(emphases in original)

46.    Since its launch in March 2012, Subsys was, and remains, extremely expensive, especially as dosage strengths increase from 100 mcg to 1600 mcg. Every year since its launch, Insys has increased Subsys's prices. The chart below summarizes the cost of a 120-dose supply of Subsys at each available dosage as of the month and year indicated:

| Strength (mcg) | December 2012 | December 2013 | December  2014 | December 2015 |
|---|---|---|---|---|
| 100 | $2,830.08 | $3,350.40 | $3,960.98 | $4,336.80 |
| 200 | $3,577.20 | $4,232.40 | $5,002.82 | $5,478.00 |
| 400 | $5,192.88 | $6,144.00 | $7,263.43 | $7,953.60 |
| 600 | $6,742.56 | $7,977.60 | $9,430.67 | $10,326.00 |
| 800 | $8,302.80 | $9,828.00 | $11,617.56 | $12,721.20 |
| 1200 | $11,470.80 | $13,536.00 | $18,861.34 | $20,652.00 |
| 1600 | $14,638.80 | $17,275.20 | $23,235.12 | $25,442.40 |

**Anthem's Coverage of Subsys Prescriptions**

47.    Anthem offers prescription drug benefits. Anthem members who have Anthem prescription drug coverage may receive reimbursement for medications that are available on Anthem's drug list, or formulary, and for which the prescriptions meet all coverage criteria.

48.     Due to the high volume of prescription drug claims for reimbursement submitted to Anthem, Anthem is unable to process all of the claims directly. Anthem has contracted with a pharmacy benefit manager ("PBM"), Express Scripts, Inc. ("ESI"), who is responsible for enforcing Anthem's drug coverage criteria.

49.     Subsys is not currently on Anthem's formulary. However, a member can make a non-formulary request which requires a medical necessity review.

50.     Because Subsys is a dangerous opioid and has high abuse potential, Anthem – like many other insurers – will only reimburse for Subsys prescriptions that meet the FDA approved indication.

51.     Further, to ensure that Subsys is properly prescribed, and reimbursable, the prescriber or patient must obtain a prior authorization before prescriptions for the drug can be reimbursed.

52.     To obtain a prior authorization, the prescriber must confirm that (1) the patient has a diagnosis of cancer with breakthrough pain, and (2) the patient is already receiving opioids and is tolerant to opioid therapy. Anthem's Subsys prior authorization form is attached as Exhibit 1.

**Managed Care and Anthem's Plans**

53.     Anthem is an insurer and third-party claims administrator for employer group-health plans that are sponsored by employers and provide benefits to their covered employees and dependents. Anthem provides insurance and/or administrative services to these employer-sponsored health plans, including the processing of claims for reimbursement of medical services provided to the individuals covered by these benefit plans.

54.     For the Anthem plans that are insured directly by Anthem ("fully-insured plans"), Anthem will resolve claims and make benefit payments from its own assets.

55.     As noted, Anthem also provides administrative services to self-funded group health plans ("self-funded plans"). Anthem delivers these services pursuant to Administrative Services Agreements ("ASAs") between Anthem and the health plan's

{00378352.1 }

sponsor (usually an employer), which identify the rights and obligations of each party.

56.     Anthem has paid claims to Insys on behalf of 39 self-funded plans which are subject to this lawsuit. The spreadsheet attached as Exhibit 3 to this Complaint identifies each of the self-funded plans at issue, as well as the amounts billed to, and paid on behalf of, these plans.

57.     For all (or nearly all) of the self-funded plans at issue, Anthem serves as the authorized claims-review fiduciary. Specifically the ASAs state:

> Pursuant to Section 405(c)(1) of ERISA, Employer delegates to Anthem fiduciary authority to determine claims for benefits under the Plan as well as the authority to act as the appropriate fiduciary under Section 503 of ERISA to determine appeals of any adverse benefit determinations under the Plan. Anthem shall administer complaints, appeals and requests for independent review according to Anthem's complaint and appeals policy, and any applicable law or regulation unless otherwise provided in the Benefits Booklet.  In carrying out this authority, Anthem is delegated full discretion to determine eligibility for benefits under the Plan and to interpret the terms of the Plan

58.     As described above, Anthem is a fiduciary in its role as claims administrator of each of the plans reflected in Exhibit 3 to this Complaint, in that each plan delegates to Anthem discretionary authority to determine claims for benefits. In this fiduciary capacity, Anthem has processed claims and/or addressed appeals on behalf of all of the self-funded plans.

59.     Similarly, all (or nearly all) of the self-funded plans at issue in this matter the ASA gives Anthem the authority and discretion to recover overpayments. Specifically, the ASAs state:

> Employer grants Anthem the authority and discretion to . . . (1) determine and take steps reasonably necessary and cost-effective to effect recovery; (2) select and retain outside counsel; (3) reduce any recovery obtained on behalf of the Plan by its proportionate share of the outside counsel fees and costs incurred during litigation or settlement activities to obtain such recover; and (4) negotiate and effect any settlement of the Employer's and Plan's rights . . . .

60.     Accordingly, Anthem has authority to seek recoveries on behalf of the self-funded plans at issue in this matter in addition to seeking recovery for payments made by Anthem's fully-insured plans.

**Insys's Scheme**

61.     On information and belief, in order to increase the number of Subsys prescriptions for which it received reimbursement and to obtain reimbursement for off-label prescriptions of Subsys, Insys directed and engaged in a conspiracy with prescribers to increase the number of Subsys prescriptions written and to provide material misrepresentations during the prior-authorization process regarding whether patients had breakthrough cancer pain and/or were opioid tolerant in order to obtain reimbursements for those prescriptions.

62.     As described below, Insys's scheme involved several components. Insys marketed Subsys off-label to prescribers who were likely to write off-label prescriptions for Subsys and then paid the prescribers kickbacks—disguised as speaker fees—to write off-label prescriptions and to induce other prescribers to do the same. Then, once Insys had an off-label prescription, it lied to insurance companies through its internal reimbursement center employees to get the insurance companies to cover off-label prescriptions for Subsys.

**i.     Off-label Marketing**[1]

63.     One of the first steps Insys took in its scheme was to market Subsys for off-label use. Subsys was only approved for use in patients over the age of eighteen with breakthrough cancer pain who were opioid tolerant, a market that is estimated to include between only one and two million patients in the United States. Given the narrow FDA indication for Subsys and the relatively small patient population for this narrow indication, Insys knew that its profitability depended on its ability to get prescribers to write off-label prescriptions for its dangerous and expensive drug.

64.     On information and belief, Insys targeted certain high-volume opioid

---

[1] The allegations containing quotes from correspondence are—unless otherwise noted— based on New Jersey Attorney General Christopher S. Porrino's investigation into Insys as reflected in his complaint filed on October 5, 2017, against Insys: *Porrino v. Insys Therapeutics, Inc.*, Superior Court of New Jersey, Chancery Division, Middlesex Vicinage.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

prescribers, particularly high-dose prescribers of Actiq (and its generics), which Insys knew was mostly prescribed to non-cancer patients. Insys devised and instituted a focused targeting strategy designed, in tandem with its incentive compensation structure and other marketing tactics described below, to promote off-label Subsys prescriptions.

65.     On information and belief, Insys provided its sales force with target lists of healthcare providers—including dentists and podiatrists—who could write prescriptions for controlled dangerous substances. Insys ranked the targets by deciles based on the targets' likelihood of becoming a high-volume, high-dose (and lucrative) Subsys prescriber.

66.     Even though Subsys was only approved for treatment of breakthrough cancer pain, on information and belief, Insys's target lists focused on high-decile opioid prescribers with few, if any, BTCP patients.

67.     Indeed, on information and belief, Insys's express marketing strategy, upon launch, was to focus efforts on high-decile prescribers rather than oncologists. Insys knew that few oncologists prescribed Rapid Onset Opioids like Subsys and that many oncologists were reluctant to refer patients to pain doctors.

68.     On information and belief, Insys knew that it needed to target high-volume opioid prescribers who were willing to write off-label prescriptions to be successful and it trained its sales force accordingly.

69.     At a national sales meeting in or about 2014, Insys's Vice President of Sales, Alec Burlakoff, offered the following advice to the assembled sales force about how to deal with a prescriber who says they have very few patients with breakthrough cancer pain:

> [t]hese [doctors] will tell you all the time, well, I've only got like eight patients with cancer. Or, I only have, like twelve patients that are on a rapid-onset opioids [sic]. Doc, I'm not talking about any of those patients. I don't want any of those patients. That's, that's small potatoes. That's nothing. That's not what I'm here doing. I'm here selling [unintelligible] for the breakthrough pain. If I can successfully sell you the [unintelligible] for the breakthrough pain, do you have a thousand people in your practice,

{00378352.1 }

a thousand patients, twelve of them are currently on a rapid-onset opioids [sic]. That leaves me with at least five hundred patients that can go on this drug.

70.     Consistent with Insys's company-wide practice of pushing Subsys off-label, Insys created a presentation titled, "Overview of Managing Chronic Pain in Cancer Survivors: Benefit-Risk of Long-Term Opioid Therapy." On information and belief, Insys disseminated this PowerPoint to numerous doctors to be presented to other healthcare providers to push the prescription of Subsys for the treatment of chronic—not breakthrough—pain, in cancer survivors, not cancer patients. According to the New Jersey Complaint, many of these healthcare providers ultimately gave this presentation at Insys sponsored lunches, dinners, and other "educational programs," effectively encouraging other providers to write off-label Subsys prescriptions.

### *Insys Overcame the 100 mcg Starting Dose Hurdle*

71.     According to the FDA-approved Subsys label and for the express purpose of protecting patient safety, patients must be started on Subsys at a 100 mcg dose and titrated to a dose that adequately relieves the patient's BTCP.

72.     On information and belief, Insys believed that the 100-mcg starting dose mandated by the FDA was an impediment to greater profits. *First*, Insys believed that it would be more difficult to convert a patient to long-term Subsys use if the patient began on only a 100 mcg dose. *Second*, the 100 mcg dose is the least expensive, so starting patients on higher doses yielded exponentially more profit to Insys.

73.     On information and belief, Insys used several strategies to overcome the FDA-mandated 100-mcg starting dose, including the (i) "effective dose" strategy, (ii) Subsys "Switch" program, and (iii) "Super Voucher" program.

### *The "Effective Dose" Strategy*

74.     On its face, the "effective dose" strategy was a push for prescribers to titrate patients to higher doses of Subsys. Titration may be appropriate for some BTCP patients who were initiated on Subsys using the starting dose of 100 mcg. That, however, was not

Insys's approach to titration.

75. Rather, Insys pushed its sales force to ensure that prescribers would write initial prescriptions of Subsys at higher—and, therefore, more lucrative—doses. This was accomplished by pressure tactics from Insys's senior management.

76. According to the New Jersey Complaint, Insys CEO Michael Babich emailed all regional sales managers, stating as follows: "We are seeing a number of 60 units of the 100 and 200 mcg still come through. Our number 1 goal right now is effective dose and having reps promoting 60 units of the low strengths is not going to cut it. ... Reps having doctors write scripts for 60 units at 100 mcg will be monitored. I will let you know when the voucher is officially switched to block this."

77. According to the New Jersey Complaint, Babich blind copied that email to John N. Kapoor Ph.D. ("Kapoor"), Insys's founder, principal shareholder, and then-Board chairperson. Kapoor is a billionaire pharmaceutical entrepreneur, who, the Wall Street Journal has reported, is "known for applying aggressive marketing tactics and sharp price increases on older drugs." Joseph Walker, Fentanyl Billionaire Comes Under Fire as Death Toll Mounts From Prescription Opioids, WALL STREET JOURNAL, November 22, 2016, at A8. Kapoor was indicted in October 2017 on charges that he used bribes and fraud to prop up sales of Subsys.

78. On information and belief, the Insys sales force began receiving daily reports any time a sales representative's prescriber wrote a prescription for Subsys at the 100 mcg or 200 mcg level. These reports became known as "Daily Rep Report for Low Strength Usage." Within twenty-four hours of receiving the report, the sales representative was required to explain (1) why the low dose was used and (2) how the prescriber plans to titrate the patient to the effective dose.

79. On information and belief, Insys believed it was better to wait until a sales representative could convince a prescriber to prescribe an initial dose higher than 100 or 200 mcg than to allow the prescriber to start a patient at the FDA-mandated 100 mcg level.

{00378352.1 }

1

*The Subsys "Switch" Program*

2      80.     In addition to the "effective dose" strategy, Insys marketed Subsys off-label

3  through its implementation of the Subsys "Switch" program within the first year of

4  Subsys's launch. The goal of the "Switch" program was to convert high-dosage (1200

5  mcg or 1600 mcg) Actiq patients (and later on, other TIRF patients) to the same high

6  dosage of Subsys.

7      81.     The "Switch" program was implemented in direct contravention of the

8  Subsys label's explicit instruction that "SUBSYS is not bioequivalent with other fentanyl

9  products. Do not convert patients on a mcg per mcg basis from other fentanyl products. . .

10  . [T]he substitution of the same dose of SUBSYS for the same dose of any other fentanyl

11  product may result in a fatal overdose."

12      82.     According to the New Jersey Complaint, in furtherance of the Switch

13  program, in October 2012, Insys prepared and disseminated a standard operating

14  procedure that made clear that the purpose of the program was to convert "115 patients"

15  currently taking high-dose generic Actiq to the same dose of Subsys, and to maintain them

16  on that dose for one year, which could generate between $15,829,704 and $20,201,544."

17      83.     Insys's push for one-to-one off-label conversions from Actiq to Subsys was

18  relentless and central to its marketing strategy. On information and belief, high-level

19  executives routinely sent emails to the sales force regarding the "Switch" program and

20  reminding them about the lucrative bonuses they would achieve upon successfully

21  converting patients.

22      84.     According to the New Jersey Complaint, on November 6, 2012, Babich

23  emailed the sales force instructing them to "challenge your doctors who still use Actiq to

24  try the switch program" and expressing that he is "anxious to sign that first 30K bonus

25  check that quarter. It will be one of those big checks like they give out in gold [sic]

26  tournaments. Happy Gilmore style!"

27      85.     The "Switch Program" was especially nefarious because it was well-known

28  to Insys at the time, especially to Burlakoff—who was formerly employed as an Actiq

promoter—that most Actiq prescriptions were written off-label. Indeed, upon approving Subsys, the FDA noted that "the Actiq RiskMAP quarterly reports" show that "the use of Actiq in noncancer pain has exceeded its use in cancer pain" and that Actiq was "used primarily in opioid-tolerant patients with chronic non-cancer pain."

86.     Nonetheless, Insys directed its sales personnel to target Actiq prescribers. According to the New Jersey Complaint, in April 2012, the month following Subsys's launch, Shawn Simon, then-Insys Vice President of Sales and Managed Markets, sent the entire Insys sales force an email providing guidance "[f]or those of you want to sell more faster ... which is ALL OF YOU." In that email, among other things, Simon explained that a key "point of entry" for a physician considering placing a patient on Subsys is on "REFILLING a patient's Rx for Fentora or Actiq."

87.     According to the New Jersey Complaint, the next day, Frank Serra, Insys's former Northeast Regional Sales Manager, gave his sales team an even more focused target list of high volume and high dose Actiq prescribers, the vast majority of whom were not cancer specialists. Serra noted that this list provided a "tremendous amount of opportunity" to "maximiz[e] the chance to make money" and noted that "[t]here should be no reason we can't get at least 2 of these scripts per day."

88.     According to the New Jersey Complaint, on September 27, 2012, Burlakoff, using a colleague's email address, sent the sales force another focused target list of high-dose Actiq writers, highlighting the importance of the "Switch" program, particularly at converting higher dose prescriptions: "As I am sure you know, the 'switch' program is our #1 sales undertaking at this juncture. We have been working diligently to 'fine tune' each individual sales representative's Actiq 1200 mcg and 1600 mcg spreadsheet, in order to provide you with the most detailed and focused sales tool to be utilized while visiting these highly viable targets in your territory—beginning tomorrow!"

89.     Burlakoff noted that he was "super excited" to announce this program, as it "affords us all a tremendous opportunity to get patients on Subsys." This "highly aggressive" program, Burlakoff further explained, has "one and only one goal in mind[:]

{00378352.1 }

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    Your #1 initiative is to drive sales at all levels."

2        90.    Notably, Insys's Board of Directors, as well as Kapoor personally, actively

3    monitored the Actiq conversions.

4        *The "Super Voucher" Program*

5        91.    A central component of the "Switch" program was its overlap with another

6    of Insys's "patient assistance programs": the "Super Voucher" (or giveaway) program.

7        92.    As a general matter, based on internal Insys documents and

8    communications, Insys utilized the Super Voucher program to provide free Subsys

9    prescriptions to prescribers. On information and belief, the Super Voucher program (i)

10    assisted the sales force in converting prescribers to Subsys, (ii) rewarded loyal and active

11    prescribers, and (iii) allowed Insys to build a history of Subsys use for patients, thus

12    making it easier to get prior authorizations from insurers.

13        93.    In the case of the "Switch" program, the Insys sales force was heavily

14    encouraged to use the Super Vouchers to secure Actiq (and other TIRF) conversions at the

15    most lucrative high doses. According to the New Jersey Complaint, Burlakoff and others

16    directed the sales representatives to focus on high-dose conversions: "In the spirit of

17    providing the best product in class, Insys has agreed to grant patients across the nation

18    who are currently taking 1200 mcg and 1600 mcg of Actiq an opportunity to 'switch' to

19    Subsys. DROP EVERYTHING YOU ARE DOING, VISIT THESE TARGETS, AND

20    GIVEAWAY FREE PRODUCT!"

21        94.    According to the New Jersey Complaint, in another email sent to each sales

22    representative individually, Burlakoff instructed on how to succeed on the "Switch"

23    program: "Do me a favor, please be sure to utilize the attached list of specific doctors that

24    Xun sent out. This list identifies the specific doctors in your territory whom [sic] have

25    written a generic prescription of Actiq for 1200mcg or 1600mcg with in [sic] the last 12

26    weeks. What doctor would not jump at the opportunity to provide one of his or her

27    patients a free 'indefinite' prescription opportunity to "SWITCH" from a generic product

28    that causes dental carries [sic] and increases the risk for death to children and pets[?]"

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

95.     According to the same Complaint, Burlakoff further explained that "[t]he key" was to "have the doctor identify a 'switch' patient while you are in the office," then to call Insys corporate headquarters requesting that a "super voucher" be called into a pharmacy "under the doctor's name for a specific # of units and strength," and then "the physician sends the patient to the pharmacy."

96.     To be clear, the Super Vouchers could be used by patients to obtain at least a one-month supply of Subsys at any dosage, including 1200 mcg and 1600 mcg. Indeed, in the case of the higher doses, Insys continued to supply free Subsys on a month-to-month basis until it was able to secure a prior authorization from the insurer.

97.     On information and belief, Insys believed that if it gave patients free Subsys, the patient would become his or her own best advocate in getting the insurance company to pay for additional Subsys prescriptions.

98.     In sum, through its various programs, Insys repeatedly and purposefully marketed Subsys in direct contravention of its FDA-approved label, risking patients' lives in the process.

*Insys Provided Untrue and Misleading Sample Letter of Medical Necessity to Facilitate Prior Authorization of Off-Label Subsys Prescriptions*

99.     As part of Insys's off-label marketing scheme, Insys created and disseminated to prescribers across the Nation several template letters of  medical necessity ("LMN") containing language it deemed sufficient to secure insurance reimbursement for off-label Subsys prescriptions. As Insys came to learn more about the prior authorization requirements for each insurer with whom it regularly communicated, these template LMNs grew increasingly more sophisticated and deceptive.

100.     The New Jersey Complaint alleges that the templates referenced "severe pain" or "breakthrough pain" without reference to cancer.

101.     The New Jersey Complaint also alleges that Insys eventually developed a template that it referred to as its "strong LMN." This template was apparently replete with representations about the provider's experience with Subsys and the patient's need for

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

Subsys. On information and belief, the "strong LMN" stated that the doctor submitting the LMN had "studied, lectured and written about chronic pain, including breakthrough pain," and that the doctor "would expect this necessity [to take Subsys] to continue for a life-long period."

102.    The New Jersey Complaint alleges that Insys had a "Perfect Cancer LMN" that it used exclusively for on-label uses (i.e., a 100 mcg dose to treat BTCP in a patient with an active cancer diagnosis and is opioid tolerant.) Thus, it appears that the "strong LMN" had no other purpose other than to facilitate Insys's off-label campaign.

*Insys Directly Misled Patients to Promote Subsys for Off-Label Purposes*

103.    On information and belief, Insys sales representatives went so far as to contact patients directly to push Subsys.

104.    As evidenced by the New Jersey Complaint, the New Jersey Attorney General's investigation revealed that Insys sales rep, Melina Ebu-Isaac, met with patient, Sarah Fuller, to "teach" Ms. Fuller about Subsys and, more specifically, to explain how Subsys "would help her greatly with chronic pain," a clearly off-label indication. Ebu-Isaac misled Ms. Fuller about the safety and efficacy of Subsys, its addictive traits, and its grave risks. Shortly thereafter, Ms. Fuller died of a Subsys-induced overdose.

105.    The New Jersey Complaint alleges that in another example of the sales force's direct contact with patients, on June 3, 2013, another Insys sales rep, Susan Beisler, directly emailed a patient of a New Jersey doctor with a draft LMN requesting, in the name of the patient, insurance coverage of Subsys for the off-label purpose of "severe chronic intractable pain."

*Insys Purposefully Compensated Its Sales Force In A Manner That It Knew, Or Should Have Known, Was Likely To Result In Illegal Conduct*

106.    In furtherance of its illicit off-label marketing scheme, Insys motivated its sales force to unscrupulously sell Subsys by any means necessary, including through its compensation structure, which was heavily weighted on commissions and rewarded the achievement of certain goals known to the company to increase off-label Subsys

1   prescriptions.

2        107.   According to the New Jersey Complaint, in an industry in which bonus

3   compensation and aggressive management are not unique, in or around 2016, an outside

4   consulting firm concluded that Insys's incentive compensation structure was troubling

5   because it incentivized non-compliant behavior and was "way outside the norm."

6        108.   During his office's investigation, the New Jersey Attorney General found

7   that as recently as June 2016, in response to the consulting firm's findings, Insys

8   Executive Vice President and former COO Daniel Brennan ("Brennan") emailed Kapoor

9   to relay his serious concerns about Insys's "overall sales rep compensation" structure, as

10  well as Insys's hiring of subpar pharmaceutical representatives. In particular, Brennan

11  explained that Insys is "still creating an environment of non-compliance by paying a low

12  base salary (barely above minimum wage) and then very high ratio of incentive pay as

13  their overall comp."

14       109.   Indeed, as Brennan explained to Kapoor, the consulting firm's interviews of

15  Insys's employees revealed that they themselves found that Insys's "compensation

16  structure encouraged inappropriate behavior," which Brennan assumed to mean "off label

17  promotion and quid pro quo behavior."  In Brennan's words, "with a potent pain product

18  like [Subsys] ha[s], it is dangerous to have so little previous pharma experience/training."

19  Brennan "strongly recommended" a change in payment structure "that is more in line with

20  industry standards and creates a more compliant-behaving sales organization (important

21  given the scrutiny we have with DOJ and media coverage of our company—both affecting

22  our reputation and trust with customers and our internal personnel)."

23       110.   After Kapoor forwarded Brennan's email to Insys Board Member Patrick

24  Fourteau, Fourteau replied to Brennan by stating that he did "not like either the tone or the

25  substance of [Brennan's] message."

26       111.   When Kapoor responded to Brennan s email the following day, he, among

27  other things, attempted to shift the blame from Insys to Brennan: "To be entirely honest, I

28  am a little concerned that your email directly follows on the heels of the recent

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   termination discussions (and actions) related to your commercial team."

2        **ii.**     **The Payment of Illegal Kickbacks**

3       112.   A critical component of Insys's off-label marketing campaign included

4   paying prescribers illegal kickbacks to write off-label prescriptions for Subsys.

5       113.   Some of these payments were made pursuant to a sham "speaker program"

6   that Insys created to shield the illegality of its financial arrangements with the conspiring

7   prescribers.

8       114.   Through this "speaker program," Insys paid prescribers to give presentations

9   on Subsys, purportedly to increase brand awareness via peer-to-peer educational lunches

10  and dinners.

11      115.   Most of the presentations, however, would make only a cursory mention of

12  Subsys, and in some presentations, there was no mention of Subsys at all. And many were

13  attended only by the prescriber and sales representatives or others individuals who had no

14  authority to prescribe the drug – thereby eliminating any question of the programs' utility

15  beyond masking Insys's real intent to pay prescribers for prescriptions.

16      116.   According to the New Jersey Complaint, Insys routinely equated successful

17  "speaker programs" or "ISPs" with a high "return on investment" or "ROI." Moreover,

18  Attorney General Porrino learned that Insys's own documents reveal that Insys intended

19  that its "speakers" would write Subsys prescriptions in exchange for more ISB events.

20      117.   For example, the New Jersey Complaint alleges that by email dated March

21  14, 2013, Burlakoff noted that the only sales representatives to whom Insys should

22  allocate speaker-fee funds are those who "get the most bang for their buck using our

23  money." In that email, he griped, "I am tired of giving money to reps whom [sic] produce

24  zero return on investment" and stated that "[t]hose whom [sic] do not produce ROI from

25  programs should not be spending our ISP dollars[.]"

26      118.   The prescribers chosen for these lucrative speaking opportunities is further

27  evidence of the true motivation behind the program. On information and belief, Insys

28  targeted prescribers running pain clinics – particularly those who were high-volume

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

opioid prescribers – for these "speaker programs," as opposed to oncologists treating patients that met the conditions set forth in the label.

119.    In fact, Insys believe it could not survive as a company if doctors only prescribed Subsys for its FDA-approved used. Former National Director of Sales for Insys, Richard M. Simon (who has also been indicted on criminal charges stemming from his role in Insys's scheme) reminded a sales representative that he had to convince his speaking prescriber to promote Subsys off-label and that if the prescriber only promoted Subsys for on-label uses, he would ruin the Company:

> I need confirmation from YOU that you had a conversation with . . . [the prescriber] where he will not ONLY promote for cancer patients. If he does this he will single handedly take down the whole company. He MUST creatively share how docs write this product everywhere. Please get back to me ASAP with confirmation that he will share with our other speakers how effective . . . [Subsys] will be to treat ALL BTP [Breakthrough Pain.]

Indictment ¶ 79, *U.S. v. Babich, et al.*, No. 1:16-cr-10343, ECF No. 1 (D. Mass.).

120.    According to the New Jersey Complaint, Insys management regularly instructed its sales representatives to offer speaking engagements to the "docs" who show a "willingness to prescribe," which, as Serra explained to his sales force in August 2012, "is basically why we have jobs." Notably, in that same email, Serra expressly discouraged his sales representatives from targeting oncologists as possible speakers, instead instructing them to focus their efforts elsewhere because "[r]ight now there are way too many Pain Targets that need to prescribe."

121.    The next month, Burlakoff emailed the entire sales force, with a blind carbon copy to Kapoor, to reiterate this point: "If you cannot guarantee that [a speaker] program will yield positive results, the program should not take place." Burlakoff explained that "[t]hese programs have been offered to you as the #1 opportunity to grow your business" and reminded them that they "get paid to produce tangible results."

122.    According to the New Jersey Complaint, when a particular doctor of one Insys sales rep fell behind on his Subsys prescribing quota after receiving speaker fees, the sales rep's supervisor e-mailed her, stating: "You need to push/pull through whatever .

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

. . PAID RXs you can [from the doctor] btwn now and the 31st. [The doctor] is like 30K short still of just breaking even." The sales rep apparently forwarded the e-mail to the doctor's personal e-mail address.

123.    The sales rep also forwarded the same doctor an e-mail from Linden Care Pharmacy, which stated: "[W]e have not seen many scripts from [this doctor], is there a problme [sic] we should know about?"

124.    The following exchange between two Insys Sales reps illustrates that Insys was not really seeking skilled doctors who could educate others about Subsys. Insys was simply looking for anyone who could help them sell more Subsys. In the exchange, former Insys sales rep Karen Hill, who pleaded guilty to charges stemming from her role in Insys's illegal kickback scheme, advised one of the sales reps she managed to find and solicit "speaker whores"—doctors who "speak for everybody" and were "willing to speak and get paid to write the prescriptions." Below is a transcript of Hill's conversation with the other Insys sales rep ("SSP-1"), as found in the factual resume to Hill's plea agreement:

| SSP-1: | *I think you said it best earlier. I think you said something to the effect of "You know, you've got to find speakers that are willing to speak and get paid to write the prescriptions. How are you identify these speakers, Karen? How can I drive—* |
|---|---|
| Hill: | *I'll tell you how. Any doctor that's money hungry, or that are just going through divorce, or doctors opening up a new clinic, doctors who are procedure heavy. All those guys are money hungry. Doctors that speak for other companies, if they're known as like company whores, you know they speak for everybody, those guys.* |
| SSP-1: | *Ok, now alright, so let's go with speaker whores. Ok—* |
| Hill: | *Speaker whores.* |

Factual Resume, 7, *U.S. v. Hill*, No. 1:17-cr-00139-CG, ECF No. 3 (S.D. Ala.).

125.    Hill advised the sales rep to cast a wide net and offer speaking kickbacks to anybody:

| SSP-1: | *Ok, so when you're going out and doing this, are you casting a really wide net and offering it to anybody and waiting to see* |
|---|---|

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

*what their reaction is?*

Hill:        *Yes, I am.*

*Id.* at 8.

126.    Attorney General Porrino learned that in their personal communications, sales representatives frequently complained or expressed concern about Insys's bribery scheme and related misdeeds and, in so doing, revealed the true nature and purpose of the Insys speaker program.

127.    For example, in various emails, Insys sales rep Susan Beisler complained that "only Alec [Burlakoff]'s 'friends' are getting ahead because all their doctors are being paid off to write this dumb drug" and that "They WAY overdid it at Insys ...  Great job Alec ruining all our lives!!"

128.    In another example, on May 21, 2014, Beisler forwarded to a friend an email regarding a recent Insys-related investigation of prescribers, writing: "Yup. Fucked." In response to her friend's attempts to assuage her concerns by stating that "it's bad for the doc" and "not bad for your company," Beisler responded as follows: "The thing is they bribed the shit out [o]f that guy to write. The complaint shows ten other docs they also bribed."

129.    The top 10 prescribers of Subsys were paid handsomely for their participation in the speaker program – collectively receiving more than $870,000 in speaker fees in 2013 and 2014 alone.

130.    As discussed in detail below, some of the practitioners on the top 10 Subsys prescriber list have been criminally convicted of accepting kickbacks. Those prescribers include Dr. Xiulu Ruan and Heather Alfonso, both of whom prescribed Subsys to Anthem members that did not have underlying cancer diagnoses.

131.    But Insys's efforts to funnel illegal kickbacks to Subsys prescribers were not limited to speaker fees. The company also offered valuable administrative services to prescribers' offices at no charge in exchange for Subsys prescriptions. To that end, Insys created a "reimbursement unit" that was deployed to prescriber practices to handle the

{00378352.1 }

prior-authorization process. As discussed in detail below, these free services not only benefited the prescribers, but also allowed Insys to control the (false) messaging to insurers, including Anthem.

### iii.   Insys's "Reimbursement Unit"

132.    To ensure that the required lies would be conveyed to Anthem (and other payors) to obtain prior authorizations necessary for coverage for Subsys, Insys created its own "reimbursement unit" and employed it from at least January 2013 through October 2016.

133.    Like many other insurers, Anthem prohibits anyone other than one of its members (or the member's representative) or the prescriber from making a prior-authorization request.

134.    On information and belief, Insys reimbursement unit employees responded to this bar by concealing or misrepresenting their identities when seeking prior authorizations for Subsys claims for Anthem members.

135.    On information and belief, these Insys employees – at the direction of Insys executives – would inform ESI that they were calling from the prescriber's office, in order to lead ESI to believe that they were employees of the prescriber.

136.    Additionally, on information and belief, Insys blocked access to the reimbursement unit's phone number in order to hide the geographical location from which reimbursement unit employees were calling. This was done for the sole purpose of preventing those representing Anthem and other insurers from figuring out that the calls were being made from a different location than the prescriber's offices.

137.    To facilitate insurance coverage for off-label Subsys prescriptions, Insys created several iterations of what it called "Opt-In Forms" or "IRC forms." On information and believe, these forms also served to alleviate prescribers' frequently expressed concerns about the burdens of the prior authorization process, which Insys executives identified as a hurdle to securing increased Subsys prescriptions.

138.    At least one widely-used version of these forms contained a pre-printed list

of thirteen possible diagnoses for Subsys, of which only one was cancer. The other twelve were for non-FDA-approved indications, including "Chronic Pain Syndrome," "Dysphagia," and "Degeneration of cervical intervertebral disc/Degeneration of cervicothoracic intervertebral disc."

139.    In so doing, Insys misleadingly and deceptively represented to patients, insurers, and pharmacy benefit managers ("PBMs"), including the PBM for Anthem, Express Scripts, that it was appropriate and acceptable to prescribe Subsys for those off-label purposes.

140.    The New Jersey Complaint alleges that on February 27, 2013, top Insys executive Michael Gurry emailed the entire sales team, enclosing a "completed IRC" form that he deemed to be a "good example of a completed 'opt in' form," which sales representatives could use to "coach HCP offices." The attached completed IRC form was for a non-cancer patient with chronic pain, a clear off-label indication for Subsys. The New Jersey Complaint alleges that Gurry, perhaps aware of the inappropriateness of his email, attempted to recall it a few hours later.

141.    On information and belief, it was Insys's express intent that these forms be used specifically to obtain off-label Subsys prescriptions and, on information and belief, to mislead patients, insurers, and PBMs.

**iv.    Insys's Misrepresentations During the Prior-Authorization Process**

142.    Because Insys understood that PBMs and insurers would not authorize payment for non-indicated uses of Subsys, on information and belief, to obtain prior authorizations, Insys employees calling in prior-authorization requests would represent to the PBM or insurer that the patient had a cancer diagnosis and was tolerant to opioids even when that was not the case.

143.    Specifically, according to criminal complaints filed against Insys executives and a manager of an Insys team responsible for obtaining prior authorizations from insurance companies, during the prior-authorization process, Insys employees were directed to represent that the patients for whom prior authorizations were being sought

had cancer even when they did not. Insys employees were trained to answer prior authorization questions using a script, sometimes called "the spiel" to mislead PBMs and insurers.

144.    "The spiel" read: "The physician is aware that the medication is intended for the management of breakthrough pain in cancer patients. The physician is treating the patient for their pain (or breakthrough pain, whichever is applicable)."

145.    The script deliberately omitted the word "cancer."

146.    According to the criminal complaints, Insys employees were also directed to fraudulently assert that a patient had a cancer diagnosis regardless of the patient's history and regardless of whether the prescriber had prescribed Subsys for a different diagnosis.

147.    Similarly, Insys employees were directed to falsely confirm lists of tried and failed medications that would qualify the patient to try Subsys.

148.    Elizabeth Gurrieri, the Insys employee who managed the Reimbursement Center and later pleaded guilty to federal crimes for her role in Insys's illegal scheme, admitted that she "met with Michael Gurry as well as other members of the [prior authorization group] and agreed to specific schemes that would be used on the phone lines with insurers in order to defraud them." Hr'g Tr. 25:17-20, Jun. 17, 2017, available at https://www.justice.gov/usao-ma/page/file/982246/download (last visited Jan. 26, 2018). Gurrieri admitted that she "specifically directed employees to lie using a number of different methods to mislead insurers . . . [and] that multiple employees as well as Ms. Gurrieri actually lied to insurers . . . in order to gain prior authorization." *Id.* at 25:24-25, 26:1-4.

149.    As scrutiny of Insys's conduct increased, Gurrieri e-mailed a colleague asking whether Gurrieri should delete the spiel and scripts.

150.    According to the New Jersey Complaint, on May 30, 015, Gurrieri emailed a colleague, attaching the script and other documents and asked: "Think we should delete these? They have the spiel and the answers to questions. I put this together a long, long time ago." Less than a minute later, her colleague responded: "OMG DELETE!" Soon

{00378352.1 }

1   thereafter, Gurrieri replied: "Deleting it now."

2       151.   Just as it did with its sales force, Insys instituted a compensation structure

3   for its IRC employees that incentivized fraud.

4       152.   Specifically, Insys paid its IRC staffers based on their ability to meet

5   individual and group quotas for Subsys prior authorization approvals. Once the minimum

6   group quota was satisfied—which former Prior Authorization Specialist, Nixon, referred

7   to as the "gate threshold"—a bonus per prior authorization approval accrued for the team.

8   To qualify to receive his or her share of the group bonus, however, an IRC staffer would

9   have to meet his or her individual quota too. Any individual staffer who exceeded thirty

10   approvals per week would accrue an additional bonus per each successful approval

11   secured.

12       153.   Because the majority of opt-in forms that the IRC received were for off-

13   label Subsys prescriptions, and because most insurers and PBMs would not authorize

14   payment for Subsys without an appropriate diagnosis, the IRC's incentive compensation

15   structure—like the incentive compensation scheme Insys established for its sales force—

16   provided a strong incentive for each IRC staffer to commit the fraud that Insys required.

17       154.   Once Insys had bribed doctors to prescribe Subsys for off-label uses and

18   then successfully deceived insurance companies or PBMs, it sometimes faced one last

19   practical hurdle—patient co-pays. Insys's solution was simple: just waive patient co-pays

20   and remove the patient's contractual incentive to seek a less expensive (and perhaps less

21   dangerous and addictive) treatment.

22       **v.**   **Insys eliminates patient co-pays**

23       155.   Anthem has health-insurance contracts with its members.

24       156.   These contracts require the members to pay for a portion of the costs

25   associated with the healthcare products and services they consume. The member's

26   obligation is commonly referred to as the member's co-pay obligation.

27       157.   The member's co-pay is often a percentage of the cost of the service or

28   prescription such that the higher the price for the service or prescription, the higher the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    member's co-pay obligation.

2        158.    The co-pay incentivizes the member to be sensitive to the cost of their

3    healthcare and to consume healthcare services and products wisely.

4        159.    On information and belief, Insys habitually eliminated patient co-pay

5    obligations for Subsys.

6        160.    If a member was left owing a co-pay at the pharmacy, the pharmacy would

7    reach out to Insys who would then issue a super voucher to the pharmacy to eliminate

8    member's co-pay obligation or, on information and belief, would just demand that the

9    pharmacy waive the member's co-pay obligation.

10       161.    Insys waived the co-pay to remove the members' contractual incentive to

11   seek a less-expensive alternative to Subsys.

12       162.    On information and belief, by waiving Anthem members' co-pay

13   obligations, Insys caused Anthem members to fill Subsys prescriptions that they otherwise

14   would not have filled.

15       163.    Anthem then reimbursed for Subsys prescriptions that it would not have

16   paid for had the members incurred the co-pays they were contractually obligated to pay.

17   **Criminal Indictments, Pleas and Convictions**

18       164.    Insys's fraudulent scheme has received much scrutiny by the federal and

19   state governments.

20       165.    In December of 2016, several of Insys's pharmaceutical executives and

21   managers—including Babich, Burlakoff, and Gurry—were indicted for, *inter alia*,

22   conspiracy to mislead and defraud health insurance providers who were reluctant to

23   approve payment for the drug when prescribed for non-cancer patients.

24       166.    In October 2017, Kapoor was also indicted in the same case. First

25   Superseding Indictment, *U.S. v. Babich, et al.*, No. 1:16-cr-10343, ECF No. 183-2 (D.

26   Mass.).

27       167.    The indictment alleges that Babich and Burlakoff, along with their co-

28   conspirators, "sought to devise and foster a scheme to profit by using bribes and fraud to

cause the illicit distribution of [Subsys]." First Superseding Indictment ¶ 13, *U.S. v. Babich, et al.*, No. 1:16-cr-10343, ECF No. 183-2 (D. Mass.).

168.    The indictment further alleges that Kapoor, Babich, Burlakoff, and Gurry— along with their co-conspirators—"used bribes and kickbacks to try to cause practitioners to issue new prescriptions for [Subsys], as well as increases in the dosage, and volume, of existing prescriptions for [Subsys]. The bribes and kickbacks took different forms, including speaker fees and honoraria for marketing events, food and entertainment, administrative support, and fees paid to co-conspirator pharmacies." *Id.* ¶ 14.

169.    According to the indictment, Insys achieved its goal of increasing prescriptions by setting up its "reimbursement" unit, which was dedicated to obtaining prior authorization directly from insurers and pharmacy benefit managers.

170.    The indictment alleges that Kapoor, Babich, and Gurry "sought to mislead and defraud insurers, and the agents of insurers, into authorizing payment for [Subsys]." *Id.* ¶ 15.

171.    According to the indictment, Babich and Gurry "defrauded insurers and caused the illicit distribution of [Subsys] by disguising the identity and location of their employer, and by misrepresenting patient diagnoses, the type of pain being treated, and the patient's course of treatment with other medications." *Id.* ¶ 16.

172.    Among other things, the executives were charged with conspiracy to commit racketeering, conspiracy to commit wire and mail fraud, and RICO conspiracy.

173.    The Insys executives are not the only Insys employees who have been indicted for their role in Insys's scheme.

174.    In February 2016, a former Insys sales manager, Natalie Reed Perhacs, pled guilty to conspiracy to commit healthcare fraud including engaging in kickback schemes.

175.    In the plea, Perhacs admitted that she was hired to be the personal sales representative for one of Insys's most important prescribers, Dr. Xiulu Ruan.

176.    Perhacs admitted that her primary responsibility at Insys was to increase the volume of Subsys prescribed by Dr. Ruan, and his partner Dr. John Patrick Couch. This

{00378352.1 }

was accomplished by (1) handling prior authorizations for their patients who had been prescribed Subsys; (2) identifying patients who had been at the same strength of Subsys for several months and recommending that Dr. Ruan or Dr. Couch increase the patients' prescription strength; and (3) setting up and attending paid speaker programs.

177.    Perhacs admitted that because of her involvement in the prior-authorization process, she knew that the vast majority of Dr. Ruan and Dr. Couch's patients did not have breakthrough cancer pain.

178.    Perhacs admitted that she was also responsible for setting up and attending speaker programs for Dr. Ruan and Dr. Couch. Perhacs scheduled approximately one speaker program per doctor per week. For a majority of the speaker programs, Dr. Ruan and Dr. Couch either (1) repeatedly spoke to the same prescribers about Subsys, (2) spoke to just their staff about Subsys, or (3) did not speak about Subsys.

179.    Perhacs admitted that the purpose of the speaker program was not to promote Subsys, but to funnel kickbacks to high-volume Subsys prescribers.

180.    Perhacs admitted that she was provided strong financial incentives to get Dr. Ruan and Dr. Couch to prescribe Subsys. Commissions from off-label prescriptions written by Dr. Ruan and Dr. Couch resulted in Perhacs making over $700,000 between April 2013 and May 2015, when Dr. Ruan and Dr. Couch were arrested.

181.    On May 20, 2015, Dr. Ruan and Dr. Couch were indicted for (1) conspiracy to distribute controlled substances outside the usual course of professional practice and not for a legitimate medical purpose, and (2) conspiracy to commit healthcare fraud.

182.    Dr. Couch and Dr. Ruan were accused of running a pill mill and were accused of prescribing controlled substances, including Subsys, that they were paid to promote.

183.    According to the indictment, one of the objectives of their conspiracy to commit healthcare fraud was the unlawful payment to and receipt of illegal kickbacks by Dr. Ruan and Dr. Couch as an inducement and in exchange for their prescribing of Subsys.

184.   Between August 2012 and May 2015, Insys allegedly paid Dr. Ruan and Dr. Couch a combined total in excess of $115,000 for sham "speaker fees."

185.   Between April 2012 and May 2015, Dr. Ruan and Dr. Couch were alleged to have written thousands of prescriptions for Subsys, nearly all of which went to patients who did not have cancer.

186.   On information and belief, Dr. Ruan and Dr. Couch were prescribing so much Subsys that the pharmacy they owned was having trouble keeping enough Subsys in stock. Insys founder John Kapoor and Insys CEO Michael Babich flew to Alabama to meet with Dr. Ruan and Dr. Couch in person to negotiate an agreement that Insys would sell Subsys directly to Dr. Ruan and Dr. Couch's pharmacy.

187.   By early 2013, Dr. Ruan and Dr. Couch had become two of the top ten largest volume prescribers of Subsys nationwide.

188.   Dr. Ruan and Dr. Couch were subsequently accused of killing four patients.

189.   The federal trial of Dr. Ruan and Dr. Couch began on January 5, 2017, with the doctors facing more than 20 counts ranging from violations of the RICO statute to illegal drug distribution to kickbacks to wire and mail fraud to money laundering.

190.   On February 23, 2017, Dr. Ruan and Dr. Couch were found guilty of, among other things, RICO conspiracy, conspiracy to commit health care fraud, conspiracy to violate the Anti-Kickback statute, and wire and mail fraud conspiracy.

191.   Similarly, in June 2015, Heather Alfonso, an advanced practice registered nurse, or nurse practitioner, pleaded guilty to accepting $83,000 in kickbacks from Insys.

192.   As part of her plea, Alfonso admitted that she prescribed Subsys to patients who did not have a cancer diagnosis. However, prior authorizations submitted on their behalf had represented that they had cancer.

193.   Alfonso also admitted that she was paid $1,000 per speaking engagement under Insys's sham "speaker program." In the majority of instances, the only attendees at those programs were individuals who had no license to prescribe controlled substances, such as medical assistants, receptionists, friends or co-workers. Further, at the majority of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    those programs, Alfonso did not give any presentation about Subsys at all.

2        194.   Alfonso admitted that the "speaker program" influenced Alfonso to increase

3    the number of Subsys prescriptions that she wrote, which she accomplished in part by

4    finding more patients for whom she could prescribe the drugs.

5    **Anthem Members Did Not Have an Underlying Cancer Diagnosis**

6        195.   As a result of Insys's scheme, many of Anthem's members for whom

7    Subsys prescriptions were authorized and, thus, were reimbursed, did not actually have an

8    underlying cancer diagnosis.

9        196.   Anthem conducted a retrospective review of all claims for reimbursement

10   for Subsys prescriptions and reviewed the claims and diagnostic histories of the Anthem

11   members receiving Subsys prescriptions. Anthem's retrospective review of those claims

12   and diagnostic histories revealed that 54% of members with Subsys prescriptions that had

13   been reimbursed by Anthem did not actually have an underlying cancer diagnoses.

14       197.   For an additional 6% of members with reimbursed Subsys prescriptions, it

15   was unclear whether Subsys was properly prescribed for those members according to

16   FDA's indicated use. In most of those cases, the individual calling in the prior-

17   authorization request represented that the patient had a diagnosis of breakthrough cancer

18   pain.

19       198.   As a result of Insys's scheme, Anthem paid over $19 million in

20   reimbursements for Subsys prescriptions that were not covered by Anthem's plans.

21       199.   A spreadsheet with representative claims, prior authorization information,

22   and retrospective claims-history analysis is attached as Exhibit 2. Specifically that

23   spreadsheet identifies the information provided to Anthem during the prior-authorization

24   process and compares that to the results of a retrospective audit of the claims data for

25   those patients. As discussed above, the retrospective audit shows that there is no evidence

26   that those patients had cancer, contrary to the statements made during the prior-

27   authorization process.

28

## COUNT I – VIOLATIONS OF STATE LAWS PROHIBITING DECEPTIVE, UNFAIR, AND UNLAWFUL BUSINESS PRACTICES

200.    Anthem incorporates by reference the preceding paragraphs as if fully set forth herein and further alleges as follows.

201.    Insys engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of state statutes prohibiting deceptive and unlawful business practices when it knowingly and intentionally misrepresented, or caused others to misrepresent, that patients had cancer, when they did not, during the prior-authorization process. Insys also engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of state statutes prohibiting deceptive and unlawful business practices when it engaged in a kickback and off-label marketing scheme for the purposes of inducing prescribers to write Subsys prescriptions for off-label and uncovered uses.

202.    Insys's unfair or deceptive acts and practices were specifically designed to and did induce Anthem to pay for millions of dollars for Subsys prescriptions that it would not have paid but for Insys's conduct. As a result of Insys's conduct, Insys received improper reimbursements from Anthem.

a.    Insys engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, et seq.;

b.    Insys engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, et seq.;

c.    Insys engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, et seq.;

d.    Insys engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

e.    Insys engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

f.    Insys engaged in unfair competition or unfair or deceptive acts or

1   practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

2          g.      Insys engaged in unfair competition or unfair or deceptive acts or

3   practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*; and

4          h.      Insys engaged in unfair competition or unfair or deceptive acts or

5   practices in violation of Va. Code § 59.1-196, *et seq.*

6   203.   Anthem is a "consumer" within the definition of those statutes.

7   204.   As a direct and proximate consequence of Insys's and its co-conspirators'

8   acts, as alleged herein, Anthem has sustained damages, the full amount to be proven at trial.

9                          <u>**COUNT II – FRAUD**</u>

10  205.   Anthem incorporates by reference the preceding paragraphs as if fully set

11  forth herein and further alleges as follows.

12  206.   Insys and its co-conspirators, as alleged herein, intentionally made

13  misrepresentations of material facts to Anthem and ESI in the process of obtaining

14  reimbursement authorizations for Subsys prescriptions.

15  207.   Specifically, Insys and its co-conspirators made misrepresentations or

16  omissions of material fact regarding (1) whether the individuals calling-in prior

17  authorizations were Insys employees or employees of the prescriber and (2) whether the

18  patients for whom prior authorization was being sought had breakthrough cancer pain

19  and/or were opioid tolerant.

20  208.   Insys their co-conspirators intended to induce Anthem and ESI to rely on

21  those misrepresentations to make benefits payments for the associated claims for Subsys.

22  209.   Anthem and ESI reasonably relied upon Insys and its co-conspirators'

23  misrepresentations by reimbursing claims for Subsys prescriptions that it would not have

24  paid for but for the misrepresentations or material omissions.

25  210.   As a direct and proximate consequence of Insys and its co-conspirators'

26  intentional misrepresentations, and Anthem and ESI's reliance thereon, Anthem has

27  sustained damages, the full amount to be determined at trial.

28  211.   Insys engaged in aggravated and outrageous conduct with an intent to injure

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1  or defraud, or deliberately interfere with the rights of Anthem and its members, consciously

2  disregarding the unjustifiably substantial risk of significant harm to them.

3      212.    The concerted action has caused Anthem to be damaged by paying substantial

4  reimbursements for Subsys prescriptions that were fraudulent and not reimbursable. By

5  virtue of the foregoing, Anthem is entitled to an award of compensatory and punitive

6  damages together with interest and costs, an injunction prohibiting Insys from continuing to

7  engage in the tortious and unlawful conduct described above, and any other relief the Court

8  deems just and proper.

9                    **COUNT III – NEGLIGENT MISREPRESENTATION**

10     213.    Anthem incorporates by reference the preceding paragraphs as if fully set

11  forth herein and further alleges as follows.

12     214.    As alleged herein, Insys and its co-conspirators provided misrepresentations

13  of material facts to Anthem and ESI in the process of obtaining reimbursement

14  authorizations for Subsys prescriptions.

15     215.    Insys and its co-conspirators owed Anthem and ESI a duty of reasonable care

16  in obtaining and communicating information to Anthem and ESI regarding whether claims

17  for Subsys prescriptions were actually reimbursable. Instead, Insys and its co-conspirators

18  made the above-described misrepresentations without due care or competence in obtaining

19  or communicating the information.

20     216.    Insys and its co-conspirators intended that Anthem and ESI rely on these

21  misrepresentations.

22     217.    Anthem and ESI reasonably relied on these misrepresentations.

23     218.    As a direct and proximate consequence of Insys and its co-conspirators'

24  negligent misrepresentations, and Anthem and ESI's reliance thereon, Anthem has

25  sustained damages, the full amount to be proven at trial.

26     219.    Insys engaged in aggravated and outrageous conduct with an intent to injure

27  or defraud, or deliberately interfere with the rights of Anthem and its members, consciously

28  disregarding the unjustifiably substantial risk of significant harm to them.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

220.   The concerted action has caused Anthem to be damaged by paying substantial reimbursements for Subsys prescriptions that were fraudulent and not reimbursable. By virtue of the foregoing, Anthem is entitled to an award of compensatory and punitive damages together with interest and costs, an injunction prohibiting Insys from continuing to engage in the tortious and unlawful conduct described above, and any other relief the Court deems just and proper.

### COUNT IV – UNJUST ENRICHMENT

221.   Anthem incorporates by reference the preceding paragraphs as if fully set forth herein and further alleges as follows.

222.   Anthem has conferred a benefit upon Insys in the form of significant payments of benefits based on claims and charges for non-reimbursable Subsys prescriptions.

223.   Insys has received a direct benefit from those payments.

224.   Insys has voluntarily accepted and retained the payments made by Anthem for non-reimbursable Subsys prescriptions.

225.   Under the circumstances of this case, as set forth in the paragraphs above, it would be inequitable for Insys to retain the payments they have received for non-reimbursable Subsys prescriptions, which payments belong in equity and good conscience to Anthem.

226.   Anthem is entitled to recover from Insys its payments for invalid Subsys prescriptions.

### COUNT V – CIVIL CONSPIRACY

227.   Anthem incorporates by reference the preceding paragraphs as if fully set forth herein and further alleges as follows.

228.   Insys has conspired with prescribers to unlawfully, fraudulently, and deceitfully procure funds from Anthem for non-reimbursable Subsys through violations of the various Unfair and Deceptive Trade Practices statutes identified above and fraud.

229.   On information and belief, Insys executives directed Insys employees to

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   increase reimbursements received for Subsys prescriptions by (1) providing illegal

2   kickbacks to prescribers to induce them to write more Subsys prescriptions, (2) illegally

3   marketing Subsys to prescribers for off-label use, and (3) creating a reimbursement unit that

4   worked with prescribers to fraudulently obtain authorizations for non-reimbursable Subsys

5   prescriptions.

6          230.   In order to achieve and accomplish the aforementioned unlawful acts and

7   objectives, Insys and the prescribers, including but not limited to the individuals listed in

8   Exhibit 2, conspired and agreed to have Insys fraudulently call in prior -authorization

9   requests on behalf of prescribers and patients to obtain reimbursement authorization for

10  non-reimbursable Subsys prescriptions. On information and belief, certain of the

11  individuals identified in Exhibit 2 were employed by Insys but represented or implied that

12  they worked for the prescriber during the prior-authorization process. Such authorizations

13  were fraudulently obtained through misrepresentations that patients had breakthrough

14  cancer pain and/or were opioid tolerant. Insys and the prescribers understood that this

15  deceptive and unlawful arrangement would be mutually beneficial:  Insys would be able to

16  increase revenues and profits, and prescribers were paid illegal kickbacks.

17         231.   The overt acts that the conspirators have taken to further and perpetuate this

18  unlawful scheme are described in particularity in this complaint and the attachments

19  thereto. The acts include: (a) Insys's payment of illegal kickbacks to prescribers in the form

20  of "speaker fees" and other remuneration including meals in exchange for increased Subsys

21  prescriptions, (b) Insys's kickbacks to prescribers in the form of free administrative

22  services for obtaining prior authorizations for Subsys prescriptions in exchange for

23  increased Subsys prescriptions, (c) Insys employees fraudulently calling in prior -

24  authorization requests, misrepresenting that they worked for the prescribers, and (d) Insys

25  employees fraudulently misrepresenting whether patients for whom they were seeking prior

26  authorizations had breakthrough cancer pain and/or were opioid dependent during the prior-

27  authorization process.

28         232.   The concerted actions of Insys and the prescribers have caused Anthem to be

{00378352.1 }

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1  damaged in an amount to be determined at trial.

2  233.   Insys and the prescribers engaged in aggravated and outrageous conduct with

3  an intent to injure or defraud, or deliberately interfere with the rights of Anthem and its

4  members, consciously disregarding the unjustifiably substantial risk of significant harm to

5  them.

6  234.   The concerted action has caused Anthem to be damaged by paying substantial

7  reimbursements for Subsys prescriptions that were fraudulent and not reimbursable. By

8  virtue of the foregoing, Anthem is entitled to an award of compensatory and punitive

9  damages together with interest and costs, an injunction prohibiting Insys from continuing to

10  engage in the tortious and unlawful conduct described above, and any other relief the Court

11  deems just and proper.

12  **COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACT**

13  235.   Anthem incorporates by reference the preceding paragraphs as if fully set

14  forth herein and further alleges as follows.

15  236.   Anthem has health-insurance contracts with its members.

16  237.   These contracts require the members to pay for a portion of the costs

17  associated with the healthcare products and services they consume. The member's

18  obligation is commonly referred to as the member's co-pay obligation.

19  238.   The member's co-pay is often a percentage of the cost of the service or

20  prescription such that the higher the price for the service or prescription, the higher the

21  member's co-pay obligation.

22  239.   The co-pay incentivizes the member to be sensitive to the cost of their

23  healthcare and to consume healthcare services and products wisely.

24  240.   Insys knew that Anthem had contracts with its members.

25  241.   Insys also knew that these contracts often required Anthem members to pay

26  for a portion of the healthcare products and services the members consumed—including the

27  obligation to pay for a percentage of the cost associated with prescription drugs, like

28  Subsys.

{00378352.1 }

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

242.    On information and belief, Insys habitually eliminated patient co-pay obligations for Subsys.

243.    If a member was left owing a co-pay at the pharmacy, the pharmacy would reach out to Insys who would then issue a super voucher to the pharmacy to eliminate the member's co-pay obligation or, on information and belief, would just force the pharmacy to waive the co-pay.

244.    Insys waived the co-pay to intentionally interfere with Anthem's contracts with its members and to remove the member's contractual incentive to seek a less-expensive alternative to Subsys.

245.    Insys's interference was improper and was intended to overcome a patient's contractual incentive to seek the least-expensive effective treatment.

246.    On information and belief, by waiving Anthem members' co-pay obligations, Insys caused Anthem members to fill Subsys prescriptions that they otherwise would not have filled.

247.    Anthem then reimbursed for Subsys prescriptions that it would not have paid for had the members incurred the co-pays they were contractually obligated to pay.

248.    By waiving member co-pays, Insys has caused Anthem to be damaged by paying substantial reimbursements for Subsys prescriptions that Anthem members would not have filled but for Insys's tortious interference with the members' contracts with Anthem. By virtue of the foregoing, Anthem is entitled to an award of compensatory and punitive damages together with interest and costs, an injunction prohibiting Insys from continuing to engage in the tortious and unlawful conduct described above, and any other relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues in this action so triable of right.

## **PRAYER FOR RELIEF**

WHEREFORE, Anthem respectfully requests an award in its favor and granting

the following relief:

    a.    An award enjoining and prohibiting Insys and/or its agents, servants, employees, officers, attorneys, successors, and assigns from making false statements described herein in connection with obtaining reimbursements for Subsys prescriptions from Anthem.

    b.    An award of actual damages in an amount to be proven at trial.

    c.    An award of punitive damages as requested herein;

    d.    An award of the equitable relief requested herein;

    e.    An award of attorney's fees as requested herein;

    f.    An award of costs;

    g.    An award of prejudgment and post-judgment interest; and

    h.    An award of any other relief in law or equity that the Court deems just and proper.

Respectfully submitted this 23rd day of July, 2018.

**COPPERSMITH BROCKELMAN PLC**

By s/ Keith Beauchamp
    Keith Beauchamp

**ROBINS KAPLAN LLP**
    Jeffrey S. Gleason
    Thomas C. Mahlum
    Jamie R. Kurtz

*Attorneys for Plaintiffs*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on July 23, 2018, I electronically transmitted the foregoing

3

document to the U.S. District Court Clerk's Office using the CM/ECF System for filing and

4

transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

5

6

s/ Verna Colwell

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28